**MINNESOTA PUBLIC INTEREST RESEARCH GROUP and Sierra Club, Appellees,**

v.

**Earl V. BUTZ, Individually and as Secretary of Agriculture, et al., Appellants.**

**Nos. 75–1724 to 75–1726, 75–1732 and 75–1769.**

United States Court of Appeals, Eighth Circuit.

Submitted April 13, 1976.

Decided Aug. 30, 1976.

Rehearing Denied Sept. 28, 1976.

Stay Denied Nov. 8, 1976.
See 97 S.Ct. 347.

Elliot C. Rothenberg, Minnesota Public Interest Research Group, Minneapolis, Minn., and Charles Dayton, Minneapolis, Minn., for appellees.

Curtis L. Roy and William J. Keppel, Dorsey, Marquart, Windhort, West & Halladay, Minneapolis, Minn., on brief for Boise Cascade Corp., Potlatch Corp. and Northern Wood Preservers, Ltd.

Elliot C. Rothenberg and Michael Milgrom, Minneapolis, Minn., on brief for Minnesota Public Interest Research Group.

Charles K. Dayton and James A. Payne, Dayton, Herman & Graham, Minneapolis, Minn., on brief for Sierra Club.

Joe A. Walters and Frank J. Walz, O'Connor & Hannan, Minneapolis, Minn., on brief for Consolidated Papers, Inc.

Gerald L. Seck, Moen, Truk, Eastern Caroline Islands, Walker, Minn., amicus curiae for National Audubon Society.

Curtis L. Roy, Minneapolis, Minn., and George R. Hyde, Edmund B. Clark and Walter Kiechel, Jr., Appellate Section, Land and Natural Resources Division, Dept. of Justice, Washington, D. C., for appellants in Nos. 75–1724 to 75–1726.

Joe A. Walters and Frank J. Walz, O'Connor & Hannan, Minneapolis, Minn., and Walter Kiechel, Jr., Edmund B. Clark and George R. Hyde, Appellate Section, Land and Natural Resources Division, Dept. of Justice, Washington, D. C., for appellants in No. 75–1732.

Francis X. Hermann, Asst. U. S. Atty., Minneapolis, Minn., Peter Taft, Asst. Atty. Gen., and Walter Kiechel, Jr., Edmund B. Clark and George R. Hyde, Appellate Section, Land and Natural Resources Division, Dept. of Justice, Washington, D. C., for appellants in No. 75–1769.

Before GIBSON, Chief Judge, and LAY, HEANEY, BRIGHT, ROSS, STEPHENSON, WEBSTER and HENLEY, Circuit Judges en banc.

ROSS, Circuit Judge.

This environmental litigation is before this court en banc for the second time. In *Minnesota Public Interest Research Group (MPIRG) v. Butz*, 498 F.2d 1314 (8th Cir. 1974) (en banc), we affirmed an order of the district court which temporarily enjoined commercial timber cutting in the Portal Zone of the Boundary Waters Canoe Area (BWCA) pending completion by the Forest Service of its new BWCA Land Use Management Plan and accompanying environmental impact statement (EIS).[1] After the

---

1. The action of the Forest Service, which we held in our prior opinion to be major federal action requiring an environmental impact statement, relates to the administration of timber sales within the BWCA. This action may be divided into three basic categories: contract extensions, contract modifications and other

BWCA EIS and Management Plan were published by the Forest Service, plaintiffs MPIRG and Sierra Club filed the present action against the named defendants[2] claiming: 1) the Wilderness Act of 1964, 16 U.S.C. §§ 1131 *et seq.*, prohibits commercial logging in the virgin forest areas of the BWCA; and 2) the EIS and Management Plan are procedurally and substantively inadequate under the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq.* In an exhaustive opinion, the district court held: 1) the Wilderness Act prohibits logging in areas contiguous to the remaining large blocks of virgin forest in the BWCA; and 2) the EIS is inadequate under NEPA. *MPIRG v. Butz*, 401 F.Supp. 1276 (D.Minn.1975). In view of this holding, the district court permanently enjoined existing and future timber sales in the areas contiguous to the remaining virgin forest areas of the BWCA. *Id.* at 1334.

We hold that the Wilderness Act does not prohibit commercial logging in the virgin areas of the BWCA's Portal Zone and that the EIS, with exceptions discussed *infra*, is procedurally and substantively adequate under NEPA. Accordingly, we reverse.

No useful purpose would be served by reciting the complicated facts of this case. That objective has been achieved in three other reported decisions.[3] We outline only the essential facts here.

In our prior opinion, we described the BWCA as follows:

The BWCA, located in northern Minnesota, is a unique natural resource with some 1,060,000 [sic][4] acres of lakes, streams, and timber, which along with the adjoining Canadian Quetico-Superior forest forms the only canoe wilderness area in the world. The area contains more than 1,000 lakes larger than 10 acres, either connected by streams or convenient portages that allow for easy canoe travel through the wilderness area.

The BWCA is administered by the United States Forest Service as a Wilderness Area and as a part of the Superior National Forest. The Draft Management Plan of the Forest Service for the BWCA refers to the area as "unique, pristine, endangered, rugged, primitive, beautiful and fragile." Highly prized by many, including plaintiff MPIRG, the Wilderness Area affords recreational, scientific, and educational opportunities. It is also highly regarded by others, like the defendant paper and logging companies, who value the thousands of acres of marketable timber it contains.

*MPIRG v. Butz, supra*, 498 F.2d at 1316–1317.

The BWCA is divided into two zones pursuant to a regulation promulgated by the Secretary of Agriculture.[5] The Interior Zone is comprised of approximately 618,000 acres in which commercial timber cutting is not allowed. The Portal Zone is comprised of approximately 412,000 acres in which commercial timber cutting has historically been permitted and is presently allowed. The Interior Zone contains roughly 354,000 acres of virgin forest as that term has been used in this litigation.[6] The Portal Zone contains approximately 147,000 acres of virgin forest.

There are presently seven active timber sales within the Portal Zone of the BWCA.[7]

---

administrative actions required by the contracts.

2. The government defendants in this action are Secretary of Agriculture Earl Butz, and John McGuire, Jay Cravens and James Torrence of the United States Forest Service. The private defendants are the following: Consolidated Papers, Inc., Potlatch Corporation, Northern Wood Preservers, Ltd., Kainz Logging Company, Emil Abramson and Boise Cascade Corporation.

3. *See MPIRG v. Butz*, 358 F.Supp. 584 (D.Minn. 1973); *MPIRG v. Butz*, 498 F.2d 1314 (8th Cir. 1974); *MPIRG v. Butz*, 401 F.Supp. 1276 (D.Minn.1975).

4. The figure contained in the EIS at 1 is 1,030,-000.

5. 36 C.F.R. § 293.16 (1975).

6. Virgin forest has been defined throughout this litigation as land area which has never been affected by the forces of man.

7. These sales are the Shell Lake Sale, Sunnydale Sale, Jerry Creek Sale, West Tofte Sale, East Toft Sale, Beartrap Sale and Old Road

Six of the seven sales are subject to the district court's permanent injunction.[8] Approximately 5,000 acres of timber remain uncut within the enjoined sales. The remaining uncut timber is virgin timber.

The EIS and Management Plan before us were prepared with respect to all aspects of BWCA management. The EIS considers the favorable and adverse impacts of commercial timber cutting as well as the alternatives of such activity. The timber resource is described in the EIS. Six alternative timber cutting policies are considered which range from permitting logging throughout the BWCA to prohibiting logging throughout the BWCA. The Management Plan, which is designed to provide management direction for ten years, selects the timber policy considered under Alternative 3 in the EIS. That policy includes the following provisions: 1) the continuance of the two zone system of regulating commercial timber harvesting—such harvesting is permitted in the Portal Zone (except with respect to timber within 400 feet of the shorelines) but prohibited in the Interior Zone; 2) the completion of existing timber sale contracts subject to mitigation measures designed to avoid certain adverse environmental effects; 3) the requirement that a complete Environmental Analysis Report (EAR) be prepared with respect to each sale; and 4) the requirement of prompt and appropriate cover restoration.[9]

Each existing timber sale is discussed in the EIS. The size of each sale, the amount cut, the amount to be cut, the type of wood available, the geology, climate, soil, water, air, vegetation, wildlife, and scenic and aesthetic qualities are discussed with respect to the existing sales. A map of each sale is included within the EIS showing its location, the areas to be cut and the areas in which cutting is prohibited.

Furthermore, the EIS indicates that a complete EAR has been prepared with respect to each existing sale.[10] The EARs contain a discussion of the following: 1) the physical description of each sale; 2) the environmental factors which will be affected by completion of the sale; 3) favorable and adverse environmental effects of the sale; 4) various alternatives which range from terminating to completing the sale; 5) the relationship between short term uses of man's environment and maintenance of long term productivity; and 6) any irreversible and irretrievable commitment of resources.

The Forest Service is currently preparing a Timber Management Plan for the Superior National Forest, of which the BWCA is a part. This Plan will be accompanied by an EIS which will provide more detailed information on sale site selection, harvest rates and mitigation measures than is contained in the EIS and Plan before us. We assume it will also contain general information similar to that supplied in the EARs relating to each existing timber sale.

*I. The Wilderness Act.*

■ The first question is whether the Wilderness Act, 16 U.S.C. § 1131 *et seq.*, prohibits logging in the virgin forest areas of the BWCA's Portal Zone. The district court found that " * * * logging in virgin forest areas destroys the primitive character of the area logged[,]" 401 F.Supp. at 1332, and held that the Wilderness Act prohibits logging in areas which are contiguous to remaining large blocks of virgin forest. Because of this construction, the district court declared 36 C.F.R. § 293.16, the BWCA regulation promulgated by the Sec-

---

Sale. Appendix C of the EIS and Management Plan contains a description and map of each of the sales. A description of each sale is found in the district court's opinion. 401 F.Supp. at 1286–87.

**8.** The Old Road Sale is not subject to the injunction because it does not amount to an incursion into the main virgin forest area of the BWCA. 401 F.Supp. at 1287.

**9.** The format of the EIS and Plan is more thoroughly described in the district court's opinion. 401 F.Supp. at 1292–1294.

**10.** These reports were on file with the Forest Service for public dissemination during the EIS publication process.

retary of Agriculture pursuant to the Wilderness Act, invalid to the extent such logging was permitted. We hold that logging in the virgin forest areas of the BWCA's Portal Zone, excepting the shoreline areas, is not prohibited by the Wilderness Act, and that the Secretary's regulation is reasonable and valid.

Our beginning point is the Wilderness Act itself. The Wilderness Act established the National Wilderness Preservation System whereby Congress assumed the authority to establish wilderness areas in the national forests. The Act evinces a desire of Congress to preserve and protect the natural condition of certain lands, designated "wilderness areas," for present and future generations of American people. 16 U.S.C. § 1131(a). To this end, Congress provided that there shall be no commercial enterprise, including commercial logging, within any wilderness area designated in the Act. 16 U.S.C. § 1133(c). This prohibition is not absolute however. Section 1133(c) itself provides that its prohibition is " * * * subject to existing private rights," and other exceptions in the Act.

One of these exceptions relates specifically to the BWCA. 16 U.S.C. § 1133(d)(5) provides the following:

Other provisions of this chapter to the contrary notwithstanding, the management of the Boundary Waters Canoe Area, formerly designated as the Superior, Little Indian Sioux, and Caribou Roadless Areas, in the Superior National Forest, Minnesota, shall be in accordance with regulations established by the Secretary of Agriculture in accordance with the general purpose of maintaining, without unnecessary restrictions on other uses, including that of timber, the primitive character of the area, particularly in the vicinity of lakes, streams, and portages: *Provided*, That nothing in this chapter shall preclude the continuance within the area of any already established use of motorboats.

Three things are apparent from the face of this statute. First, the language "[o]ther provisions of this chapter to the contrary notwithstanding," indicates that the BWCA is to be accorded special treatment under the Wilderness Act. Second, the duty of managing the BWCA is delegated to the Secretary of Agriculture. Third, the BWCA is to be managed with a view to maintaining its primitive character without unnecessary restrictions on other uses, including timber. It is undisputed that some commercial logging in the BWCA was contemplated by Congress. The language of the statute specifically cites timber as an approved use. Whether Congress considered logging of virgin timber to be a permissible use in the BWCA's Portal Zone, in view of the duty of the Secretary to maintain the primitiveness of the area, is a question which cannot be answered without reference to the legislative and administrative context in which the special BWCA provision was passed.[11]

The administrative history of the BWCA and the legislative history of the Wilderness Act conclusively show that logging was to continue as a permissible use within the BWCA's Portal Zone under the Act. The history of BWCA management and existing circumstances in 1964 also show that logging in the *virgin* areas of the Portal Zone, except within the shoreline areas, was not prohibited by the Wilderness Act. It is undisputed that before 1964, commercial logging of *virgin* timber was a permissible use within the Portal Zone of the BWCA. Indeed, the evidence shows that, historically, virtually all commercial timber harvesting in the BWCA has occurred in *virgin* areas. Under the 1948 Forest Service Management Plan for the area, which contained language virtually identical to the special BWCA provision in the Wilderness Act, the BWCA was managed with a view to multiple use—including commercial harvesting of *virgin* timber. It is significant that in 1964, when the Wilderness Act was signed by President Johnson, twenty active timber

11. For a description of the administrative history of the BWCA and the legislative history of the Wilderness Act, see Appendix A appended to and by reference made a part of this opinion.

sales were in operation in the virgin areas of the BWCA.[12]

The special BWCA provision was intended to maintain the status quo with respect to management of the area. Nothing in the Act suggests any distinction between logging virgin as opposed to nonvirgin timber. Thus, commercial harvesting of virgin timber outside the shoreline areas is clearly a permissible use within the Portal Zone of the BWCA today.

Plaintiffs place great weight on the word "primitive" which is used in the special BWCA provision. They argue that the primary congressional policy with respect to the BWCA was to maintain the primitive character of the area. By equating primitiveness with wilderness, they argue that the purpose of the special BWCA provision was to preserve the naturalness of the area by eliminating commercial harvesting of virgin timber.

Plaintiffs' argument, we feel, misunderstands the unique niche which the BWCA has occupied in the National Forest Preservation System. The BWCA has never been managed as a pure wilderness area. The Wilderness Act did not change this management policy. The Act preserved the traditional BWCA management policy of multiple use.[13] Between 1948 and 1964, the BWCA was so managed by the Forest Service under a stated policy which was virtually identical to the language inserted into the special BWCA provision. Thus the use of the word "primitive" was not an effort on the part of Congress to finesse lumbering operations out of the BWCA. If a substantive policy change is to be made with respect to virgin timber cutting in the BWCA, that decision must come from Congress or the responsible executive agency, not from the courts.

The validity of the BWCA Regulation, now codified at 36 C.F.R. § 293.16, need not detain us long. Whether we construe the Regulation as a legislative or interpretive one, the Secretary's construction of the Wilderness Act is valid.

The Regulation preserves the two zone concept within the BWCA by creating the Interior and Portal Zones. All commercial timber harvesting is prohibited within the Interior Zone. Commercial harvesting of virgin timber outside the shoreline strips is permitted within the Portal Zone. Timber sale plans must incorporate suitable provisions for cover restoration. This construction is consistent with the Wilderness Act and its history and is, therefore, neither arbitrary nor capricious.[14]

## II. The Adequacy of the Environmental Impact Statement.

The next question is whether the agency complied with the procedural and substantive requirements of NEPA. The district court held that the EIS was procedurally

---

**12.** Three of the active timber sales at issue in this case were made before the Wilderness Act was passed. These are the West Tofte Sale, East Toft Sale and Jerry Creek Sale.

**13.** It is true, as plaintiffs argue, that when the Wilderness Act was passed, "primitive" areas were administered in the same manner as "wilderness" areas in which commercial logging was prohibited. *See Hearings on S. 174 Before the Subcomm. on Public Lands of the House Comm. on Interior and Insular Affairs*, 87th Cong., 2d Sess. 1211 (1962). At that time, however, commercial logging was permitted in the BWCA because the area was not classified as a "primitive" area under Regulation L–20, but was classified as a "recreation" area under Regulation U–3.

**14.** Plaintiffs spend many pages in their briefs arguing that the Secretary's Regulation is invalid under the Act to the extent that it permits logging in the BWCA for the purpose of producing a particular type of vegetation. Plaintiffs challenge the Selke Committee Report, on which Secretary Freeman allegedly relied, which recommended continued logging in the BWCA's Portal Zone for this purpose. They argue that only an economic purpose can be used to justify continued logging. We decline the invitation to interfere with the management function of the Secretary of Agriculture. We have found that logging of virgin timber is a permissible use of the BWCA's Portal Zone under the Wilderness Act. The Secretary's construction of the special BWCA provision is not arbitrary or capricious. How the Secretary chooses to justify the permissive use of logging, absent arbitrariness, is not a matter within the power of this court.

inadequate under NEPA in several respects and that the agency's decision to permit virgin timber harvesting in the BWCA's Portal Zone was substantively wrong under NEPA. We find that the district court's analysis was permeated with two basic misconceptions. First, the district court erroneously held that the Wilderness Act does not permit commercial logging in the virgin forest areas of the BWCA. Second, the district court's review of the EIS was infected with an impermissibly broad view of its power to review the Forest Service's substantive decision to permit logging as a vegetation management tool in the BWCA's Portal Zone. We hold that the agency, with certain exceptions relating to future sales discussed *infra,* complied with both the procedural and substantive requirements of NEPA in drafting the EIS at issue.

### A. Judicial Review under NEPA.

#### 1. Procedural Review.

Section 101 of NEPA, 42 U.S.C. § 4331, requires that the federal government use "all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources" in order to achieve a broad range of environmental goals. *Environmental Defense Fund (EDF) v. Corps of Engineers (Corps),* 470 F.2d 289, 294 (8th Cir. 1972), *cert. denied,* 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973). Section 102 of NEPA, 42 U.S.C. § 4332, provides the "action-forcing" procedural provisions which are designed to accomplish the environmental goals of Congress. Section 102(2)(C) provides that in every recommendation or report on proposals for legislation and other major federal actions significantly affecting the quality of the human environment, federal agencies

shall include a "detailed statement" by the responsible official on the following:

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

The agencies are required to carry out this function to "the fullest extent possible."[15]

▮ The "detailed statement" requirement of § 102(2)(C) serves at least three purposes. First, it requires an agency to compile an environmental record from which a court can determine whether the agency has made a good faith effort to consider the values NEPA seeks to protect. *EDF v. Froehlke,* 473 F.2d 346, 351 (8th Cir. 1972); *EDF v. Corps, supra,* 470 F.2d at 295; *Sierra Club v. Morton,* 510 F.2d 813, 820 (5th Cir. 1975); *Silva v. Lynn,* 482 F.2d 1282, 1284 (1st Cir. 1973); *Calvert Cliffs' Coordinating Committee v. U. S. Atomic Energy Commission,* 146 U.S.App.D.C. 33, 449 F.2d 1109, 1114 (1971). To accomplish this, the statement must not merely catalog environmental facts, but also explain fully its course of inquiry, analysis and reasoning. *EDF v. Froehlke, supra,* 473 F.2d at 351. Second, the statement serves as an environmental full disclosure tool by providing information to the public about the environmental costs involved in a particular project. *EDF v. Froehlke, id.,* 473 F.2d at 351; *Sierra Club v. Morton, supra,* 510 F.2d at 820.

---

**15.** NEPA established the Council on Environmental Quality (CEQ), 42 U.S.C. § 4342. Congress directed the CEQ to perform a wide range of environmental duties and functions including reviewing and appraising various programs and activities of the federal government in light of the environmental policies stated in NEPA. 42 U.S.C. § 4344. CEQ has formulated guidelines, codified at 40 C.F.R. § 1500.8, to assist federal agencies in the preparation of environmental impact statements. This circuit has accorded these guidelines substantial weight in reviewing compliance with NEPA. *Sierra Club v. Froehlke,* 534 F.2d 1289, 1294 n.17 (8th Cir. 1976).

To that end, [the statement] "must be written in language that is understandable to nontechnical minds and yet contain enough scientific reasoning to alert specialists to particular problems within the field of their expertise." (Citation omitted.) It cannot be composed of statements "too vague, too general and too conclusory." *Environmental Defense Fund v. Froehlke,* 473 F.2d 346, 348 (8th Cir. 1972).

*Silva v. Lynn, supra,* 482 F.2d at 1285. *See also Sierra Club v. Morton, supra,* 510 F.2d at 820. Third, the "detailed statement" requirement ensures the integrity of the process by requiring *reasoned* analysis in response to conflicting data or opinions on environmental issues. *Silva v. Lynn, supra,* 482 F.2d at 1285. The detailed statement serves to gather in one place a discussion of the relative impact of alternatives so that the reasons for the choice of alternatives are clear. It thus precludes having stubborn problems swept under the rug by responsible agencies. *EDF v. Froehlke, supra,* 473 F.2d at 350.

■ We have held that the test of compliance with the procedural provisions of § 102(2)(C) is one of good faith objectivity. *EDF v. Corps, supra,* 470 F.2d at 296. The touchstone of our inquiry is reason. *Iowa Citizens for Environmental Quality, Inc. (ICEQ) v. Volpe,* 487 F.2d 849, 852 (8th Cir. 1973). While the detailed statement must of course be more than a *pro forma* ritual, *EDF v. Froehlke,* 368 F.Supp. 231, 237 (W.D.Mo.1973), *aff'd per curiam sub nom. EDF v. Callaway,* 497 F.2d 1340 (8th Cir. 1974), the discussion of environmental effects and alternative courses of action need not be exhaustive. *ICEQ v. Volpe, supra,* 487 F.2d at 852.

[NEPA] must be construed in the light of reason if it is not to demand what is, fairly speaking, not meaningfully possible, given the obvious, that the resources of energy and research—and time—available to meet the Nation's needs are not infinite.

*Natural Resources Defense Council, Inc. (NRDC) v. Morton,* 148 U.S.App.D.C. 5, 458 F.2d 827, 836 (1972). *See also ICEQ v. Volpe, supra,* 487 F.2d at 852. Thus, the EIS need contain only sufficient information to permit a reasoned choice of alternatives. *Id.; NRDC v. Morton, supra,* 458 F.2d at 837. The purpose of NEPA is not to require an objection free document, but rather to give Congress, the responsible agencies, and the public a useful decision-making tool. *Cape Henry Bird Club v. Laird,* 359 F.Supp. 404, 412 (W.D.Va.), *aff'd per curiam,* 484 F.2d 453 (4th Cir. 1973).

■ We emphasize however that a final impact statement must not be so vague, general and conclusory that it cannot form the basis for reasonable evaluation and criticism. *EDF v. Froehlke, supra,* 473 F.2d at 348. The requirement of an objective, comprehensive and understandable "detailed statement" ensures that the EIS will fulfill its primary function to provide *information* as to the environmental consequences of a proposed action.

*2. Substantive Review.*

■■ In *EDF v. Corps, supra,* 470 F.2d at 298, we held that " * * * courts have an obligation to review substantive agency decisions on the merits[,]" under NEPA. The standard of substantive review under NEPA is an extremely narrow one however. The reviewing court must first determine whether the agency reached its decision after a full, good faith consideration and balancing of environmental factors. *EDF v. Corps, id.,* 470 F.2d at 300; *EDF v. Froehlke, supra,* 473 F.2d at 353. The court must then determine whether the agency's actual balance of costs and benefits was arbitrary or clearly gave insufficient weight to environmental values. *EDF v. Corps, supra,* 470 F.2d at 300; *EDF v. Froehlke, supra,* 473 F.2d at 346; *Calvert Cliffs' Coordinating Committee v. U. S. Atomic Energy Commission, supra,* 449 F.2d at 1115. A court is without power to substitute its judgment for that of the agency. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). As stated recently by the Supreme Court:

Neither [NEPA] nor its legislative history contemplates that a court should substitute its judgment for that of the agency as to the environmental consequences of its actions. The only role for a court is to insure that the agency has taken a "hard look" at environmental consequences; it cannot "interject itself within the area of discretion of the executive as to the choice of the action to be taken."

*Kleppe v. Sierra Club,* —— U.S. ——, ——, n.21, 96 S.Ct. 2718, 2731, 49 L.Ed.2d 576 (1976) (citations omitted). It is in this respect that the district court has erred as will be discussed *infra.* It has, without question, substituted its judgment for that of the agency without a sufficient basis or need therefor.

*B. Procedural Compliance under NEPA.*

*1. The Determination of Environmental Impacts*[16]*—The Matrix Approach.*

NEPA, § 102(2)(C)(i), requires that an EIS describe the impacts of a proposed action. To comply with this requirement in this case, the Forest Service relies on a series of matrices which is the product of a comprehensive study of the area performed by an interdisciplinary group of specialists

in soil, hydrology, forestry, landscape architecture, economics and wildlife. The matrices describe conclusions as to the impacts of the following management activities and uses: soils, water level management, minerals, vegetation management, wildfire, wildlife habitat, recreation activities, recreation facilities, land occupancy, historical and archeological uses and travel network and entry points. These activities are evaluated in relation to environmental factors which are classified into the following groups: physical, biological, cultural and economic. The impacts are described by use of a circle on the matrix where the horizontal column of the management activity intersects with the vertical column containing the specific environmental factor.[17]

The district court described the matrices as " * * * no more than a catalog of the Forest Service's unexplained conclusions as to the impacts of various management activities and uses[,]" 401 F.Supp. at 1309, and concluded that the matrix method does not represent an accessible means for opening up the decision-making process and subjecting it to critical evaluation outside the agency. The court below buttressed its conclusion on the basis of references to allegedly illogical conclusions contained in the matrix relating to vegetative manage-

---

**16.** The district court held, as an initial matter, that the Forest Service failed to adequately describe the ultimate goal of its vegetation management policy in its EIS and Management Plan. 401 F.Supp. at 1299–1304. We disagree. The EIS presents six alternative timber management policies which range from maximizing benefits to the local economy (Alternative 1) to maximizing primitive values (Alternative 6). 401 F.Supp. 1339–1344. Each alternative considers policies relating to: 1) allowable commercial timber harvesting; 2) existing timber sales; 3) administrative cutting; 4) mechanical treatment; 5) prescribed burning; and 6) herbicides. These policies, when read in conjunction with the matrix analysis discussed hereinafter, permit adequate assessment of the environmental impacts flowing from the various proposed actions. The district court was primarily concerned with the vegetation management policy contained in the Management Plan. Its focus was misplaced, because the major concern under NEPA is the adequacy of the timber policies *considered* in the EIS, not the substantive merits of the timber policy which

the Forest Service chose to *follow* in its Management Plan. Furthermore, the district court's criticism of the vegetation policy in the Management Plan is based on the erroneous premise that the Forest Service's sole policy is to preserve the naturalness of the area. The policy of the Plan, like the policy expressed under Alternative 3 in the EIS, is one of *multiple use.* The seemingly inconsistent policies (e. g., preserving the naturalness of the area and yet permitting some commercial timber harvesting) stated in the EIS and Plan are permitted by Congress and are the result of compromises inherent in multiple use management. They are not the result of an effort on the part of the Forest Service to finesse a timber cutting policy into the Management Plan by deceiving the public.

**17.** The matrix analysis used in this case is more thoroughly described in the district court's opinion. 401 F.Supp. at 1309. The matrix which describes the impacts of timber cutting on the BWCA is reproduced at 401 F.Supp. 1338.

ment. We respectfully disagree with both the court's result and methodology.

There is nothing in this record to indicate that the conclusions in the matrices were reached after less than good faith study. Rather, the record shows that the conclusions on the matrices were reached after intensive study by experts in various fields and good faith debate with the Forest Service staff. We discern no intent on the part of the Forest Service to mislead anyone. The EIS itself warns that the matrices are not the final word on environmental impacts because it is impossible to predict the exact effect of a use or activity.

The significant environmental effects of logging and other uses and activities are recognized and presented in a form which affords the decision maker an opportunity to weigh them.[18] The matrices digest thousands of pieces of information. Each explains the present management policy with respect to the activities and uses analyzed. Each explains ways in which the activities and uses could be mitigated. To require a narrative paragraph in lieu of each bit of information in this case would produce an unworkably cumbersome document which would be of questionable usefulness to the decision maker. The CEQ Guidelines themselves provide that the " * * * agencies should make every effort to convey the required information succinctly in a form easily understood, both by members of the public and by public decisionmakers, giving attention to the substance of the information conveyed rather than to the particular form, or length, or detail of the statement." 40 C.F.R. § 1500.8(b). Furthermore, we agree with the court in *Cape Henry Bird Club v. Laird, supra,* 359 F.Supp. at 415, that "[m]ethods of quantification are without question matters of judgment and opinion," and as such, belong within the discretion of the Forest Service.

The district court's effort to discredit the matrix approach by "second-guessing" the values assigned to specific environmental impacts was clearly improper. In the absence of a showing of arbitrariness, the values to be assigned such impacts rest within the discretion of the Forest Service, and the experts at its disposal, not the district court. As stated in *EDF v. Froehlke, supra,* 368 F.Supp. at 240:

> [NEPA] did not, in our judgment, contemplate or anticipate that courts were to make choices and determine the merits of conflicting views between the two or more schools of scientific thought and to thereafter disapprove any final EIS which may rely upon data which was inconsistent with the court's finding.

*See also Kleppe v. Sierra Club, supra,* —— U.S. at ——, 96 S.Ct. 2718. In the absence of any showing of arbitrariness or capriciousness, we find that the matrix approach in this case sufficiently describes the environmental impacts.

## 2. The Adverse Environmental Impacts—The Virgin Forest.

The district court held that the EIS is inadequate under NEPA, §§ 102(2)(C)(ii), (iv) and (v), because it allegedly fails to adequately discuss the adverse environmental effects associated with the loss of virgin timber. We disagree.

A careful review of the EIS indicates that the effects of logging on virgin forest areas is one of the primary issues considered in the statement. Loss of virgin character is specifically recognized as an unavoidable adverse impact of the specific management alternatives which permit commercial harvesting in virgin timber areas. The EIS also recognizes that some persons consider virgin timber harvesting to be " * * * an irretrievable commitment leading to irretrievable loss of parts of a

---

18. . The matrix approach has been approved in another context. *See Sierra Club v. Morton,* 510 F.2d 813, 822 (5th Cir. 1975).

natural laboratory where undisturbed natural processes can be studied." In view of the value associated with the sanctity of virgin forest, no less than three of the EIS's six alternatives consider a management policy of reserving virgin timber from commercial harvest. In response to public input respecting the value of virgin forest areas, the Forest Service recognized in the EIS that "* * * there is a need to protect much of the remaining 'virgin' timber in the BWCA." The Service assured the respondents that, in all cases where such timber is proposed to be harvested, the decision to permit cutting will be preceded by detailed environmental analyses.

It is also significant that of the 501,000 acres of virgin timber which remain in the BWCA, at least 354,000 acres located in the Interior Zone are reserved from cutting by the Management Plan. This figure is further deflated because it does not take into account the shoreline strips which are reserved from cutting in the Portal Zone. This is a strong indication, we feel, of the Forest Service's high regard for virgin timber.

The discussion of the adverse effects associated with *not* harvesting timber puts the EIS's discussion of the virgin timber issue in better context. Like most other environmental issues, eliminating timber harvesting has its disadvantages. In the opinion of some experts, a policy of no logging, given the current lack of knowledge respecting fire management, would create overaged and decadent pockets of trees with attendant insect outbreaks and greater fire danger. The absence of logging roads would decrease access to the area in time of emergency. And greater restrictions on the wood supply would adversely affect the local economy.

We do not recite the advantages of cutting virgin timber in order to inject our personal predilections into this case. We do so only to show that the values to be considered in regard to timber policy are difficult to define and compare because of their subjective nature, and to illustrate that legitimate reasons were given by the Forest Service for making the decision it did.

### 3. Alternatives.

In the EIS, the Forest Service considers six major alternative management concepts for the BWCA. These broad scope (or first order) alternatives range from the premise that satisfying local economic needs (by timber and services) does not conflict with the water-related primitive experience, to the premise that maximum protection of the natural qualities of the BWCA would provide the most primitive recreation experience. Each first order alternative considers a number of activities and uses of the BWCA, including timber harvesting, and sets forth second order alternatives for managing such activities and uses. As to timber harvesting the second order alternatives range from allowing logging throughout the BWCA (with the exception of the shoreline exceptions) to prohibiting all timber harvesting in the BWCA. Three alternatives (4–6) specifically consider the policy of prohibiting virgin timber harvesting.[19] Alternative 3—which retains the two zone concept, allows some commercial logging in Portal Zone, and preserves the existing timber sale contracts with some modifications—is recommended as the best policy.

The alternatives are evaluated by the Forest Service in relation to six inherent values[20] which summarize the unique quali-

---

**19.** The alternatives as they relate to timber harvesting are summarized at 401 F.Supp. at 1318.

**20.** The six values are: 1) natural beauty of the shorelines, 2) water travel network, 3) vegetation, 4) wildlife, 5) recreation experience, and 6) research.

ties of the BWCA.[21] The comparative advantages of the possible alternatives, the unavoidable adverse impacts of the alternatives, and the relationship between short-term use and long-term productivity for each alternative are separately discussed.

The district court rejected this approach because, in the court's view, the logging alternatives are not " * * * separately evaluated in the EIS to determine which is the superior policy." 401 F.Supp. at 1318. The court criticized the comparison of first order alternatives as a "collection of unexplained conclusions." 401 F.Supp. at 1320.

We find the evaluation of first and second order alternatives adequate under NEPA. The final Management Plan and EIS, as we recognized in our prior opinion, 498 F.2d at 1323, n. 29, were prepared with respect to all aspects of BWCA management. The record conclusively establishes that the district court's major premise, that the activities considered together are unrelated, is clearly erroneous. Timber cutting policies are interrelated to virtually every other management aspect of the BWCA, including, but not limited to, fire protection, control of insects and disease, water quality, soil, scenic qualities, recreation use, portages, wildlife, vegetative cover and roads. The CEQ Guidelines, 40 C.F.R. § 1500.-8(a)(2), require that an EIS include "[t]he relationship of the proposed action to land use plans, policies, and controls for the affected area." This requirement is peculiarly important in the BWCA because the area is governed under a multiple use forest management policy in order to provide maximum benefits to the greatest number of persons possible. The BWCA is managed for timber, recreational, scientific, historical and other uses; thus, since each activity and use affects other activities and

uses, the effects of them must be described together.

Furthermore, one of the main purposes of the "detailed statement" requirement is to elicit public input into the decision-making process. The record shows that the "package" approach was attributable in large part to the desire on the part of the Forest Service to quantify the public responses to the proposed EIS in the final document. As stated by Robert Rice, leader of the interdisciplinary team which prepared the EIS:

> * * * [W]hat we found out was that people want to talk in terms of: Should we or should we not harvest timber? Should we or should we not permit snowmobiles? Should we or should we not restrict outboard motors? Should we or should we not permit the use of herbicides? Should we or should we not do some of the other activities and uses in the BWCA like campgrounds or campsites—things of that nature. In the responses that we received, very few of them talked to alternatives or planning concept alternatives, or what we called them, first order alternatives. What the Planning Team had to do was they had to try to put together alternatives, based on the responses that we received, and it amounted to grouping. Some people wanted a smattering of all different kinds of uses and activities in the BWCA and others wanted very few uses in the BWCA, so what we tried to do was put together all of the things that would reflect some of those responses.

Record, Vol. II, at 178–179 (Nov. 5, 1974).

The EIS considers four basic approaches to commercial harvesting: 1) harvesting throughout the BWCA; 2) harvesting in

---

21. The comparative evaluation reads as follows:

Comparison Evaluation of Alternatives on the Inherent Values of the BWCA

| Values | Alternatives | | | | | |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 |
| Natural Beauty of the Shorelines | 3 | 3 | 3 | 2 | 2 | 2 |
| Water Travel Network | 2 | 2 | 3 | 2 | 2 | 2 |
| Vegetation | 3 | 2 | 2 | 2 | 1 | 1 |
| Wildlife | 3 | 2 | 2 | 2 | 1 | 1 |
| Recreation Experience | 2 | 3 | 3 | 3 | 3 | 2 |
| Research Opportunity | 1 | 2 | 2 | 2 | 3 | 3 |
| Total | 14 | 14 | 15 | 13 | 12 | 11 |

Key: 3 = best response to values
2 = average response to values
1 = least response to values
EIS at 113.

only the Portal Zone; 3) harvesting in only nonvirgin areas; and 4) *no commercial harvesting within the BWCA.* This approach was made in good faith and provides sufficient information for a "reasoned choice of alternatives" by the decision maker. *ICEQ v. Volpe, supra,* 487 F.2d at 852. The EIS thus meets the requirement under NEPA of gathering in one place a discussion of the relative environmental impact of alternatives. *NRDC v. Morton, supra,* 458 F.2d at 834.[22]

In criticizing the EIS's approach to alternative comparison, 401 F.Supp. at 1320–1323, the district court challenged the Forest Service's methodology in rating the alternatives in relation to furthering the unique qualities of the BWCA. The district court also challenged certain specific values assigned by the Forest Service. We reject this attempt to discredit the scientific conclusions contained in the EIS. The conclu-

sions are supported by data in the record. When so supported, quantification of data and resolution of the scientific conflicts presented by it are matters for the experts, not the courts. *See EDF v. Froehlke, supra,* 368 F.Supp. at 240.

### 4. The Existing Sales.

The existing sales are adequately discussed in the EIS. The EIS describes the size, the amount cut, the amount to be cut, the type of timber, the geology, the climate, the soil, the water, the air, the vegetation, the wildlife, and the scenic and aesthetic qualities with respect to the existing sales. A map of each sale is included in the EIS. Matrix 2 sets forth the physical, biological, cultural and economic impacts which continuing and discontinuing the sales would create. 401 F.Supp. at 1338. In its package of alternatives, the EIS considers four different policies with respect to the existing timber sales.[23] The selected alternative

---

**22.** The district court held that the EIS failed to consider the impact of future mining in the area and that "[t]he Forest Service should have considered the alternative of postponing the logging [in the] virgin forest areas in the BWCA until the status of private mineral rights is finally determined." 401 F.Supp. at 1317. We cannot say that the failure to discuss this impact and alternative was arbitrary. Because of practical considerations of feasibility, only reasonable alternatives must be considered under NEPA, §§ 102(2)(C)(iii) and 102(2)(D). *ICEQ v. Volpe,* 487 F.2d 849, 853 (8th Cir. 1973). The Management Plan currently prohibits mining. Thus, the prospect of future mining operations in the BWCA is hypothetical, if not speculative. Furthermore, even if mining operations are proposed in the future, an independent EIS discussing the impacts on the environment will be required since such operations would be "major Federal actions having a significant effect on the human environment[.]" *Cady v. Morton,* 527 F.2d 786, 796 (9th Cir. 1975). If and when mining becomes an environmental threat to the virgin forest, the impacts and alternatives of such activity can then be discussed.

The district court also held that the EIS was defective under NEPA, §§ 102(2)(C)(iii) and 102(2)(D) because it failed " * * * to consider the alternative of suspending commercial timber harvesting in virgin forest areas pending the development of a viable fire management program." 401 F.Supp. at 1302. Again, we cannot agree. The district court's analysis of this problem is permeated by its belief that the Forest Service is wrong in allowing logging, instead of fire and neglect, to be used as the primary tool to manage the vegetation in the

Portal Zone. 401 F.Supp. at 1301. NEPA does not direct a court to substitute its judgment for that of the agency. *Kleppe v. Sierra Club,* —— U.S. ——, ——, n. 21, 96 S.Ct. 2718, 49 L.Ed.2d —— (1976). The Forest Service's decision to use logging as a vegetative management tool is supportable. Forest fires endanger human life and wildlife and, as the district court concedes, the alternative of prescribed burning " * * * needs extensive research and development." 401 F.Supp. at 1302. Furthermore, the fire issue *is* thoroughly considered in the EIS. Matrix 2 describes the effect of 1) manipulating the vegetation by prescribed burning and 2) manipulating the vegetation by allowing selected wildfires to burn. The matrix describes these policies in relation to some 20 environmental factors grouped into the following categories: physical, biological, cultural and economic. Matrix 2 specifically describes both policies as "compatible" with the natural laboratory, which the EIS tells us reflects the impacts on virgin areas. A separate matrix describes six alternatives of managing wildfires (ranging from controlling no wildfires to suppressing all wildfires). From this matrix, fire policies are injected into each of the six alternative concepts of BWCA management.

**23.** The four alternatives are: 1) continue the existing contracts in their original form; 2) continue existing contracts with modifications in accordance with the findings of environmental analyses; 3) modify existing contracts to exclude major blocks of virgin forest and to conform to environmental analyses; and 4) cancel existing sale contracts. 401 F.Supp. at 1339–1344.

continues existing contracts subject to modifications recommended by environmental analysis.

Before the EIS was filed, an EAR was prepared with respect to each sale. The EIS refers to the EARs which were on file with the Forest Service during the publication process.

The EARs contain a comprehensive description of the areas subject to timber sales. They describe the environmental impacts as well as the favorable and adverse effects of the proposed action. Each contains a statement as to the unavoidable adverse environmental effects. The EARs analyze alternatives which range from completing the proposed sale, to modifying the terms of the sale, to canceling the sale. Each describes the relationship between short term uses and the maintenance of long term values as well as any irreversible and irretrievable commitment of resources which would occur should the proposed action take place.

Although each of the EARs recommends completion of the sale, each recommends adjustments to be made in the terms of the sale to mitigate the potential adverse effects of logging. These adjustments include deleting sensitive areas from cutting,[24] prohibiting rockraking in certain areas, prohibiting the harvesting of immature stands, limiting slash burning, requiring irregular cutting to break up large clear cut areas and limiting mechanical site preparation.

We are convinced that the EIS and EARs were prepared by the Forest Service with good faith objectivity. They provide enough specific information to permit a reasoned choice of alternatives. They are, therefore, in compliance with the "detailed statement" requirement of NEPA.[25]

### 5. The Future Sales.

Although the EIS and Management Plan adequately describe the environmental impacts and alternatives with respect to the existing sales, the overall plan for logging in the future is incomplete. The Plan and EIS are designed to serve as the Forest Service's major decision-making tools for ten years. Yet neither contain any criterion, beyond that relating to the existing sales, for determining what sites are to be logged, when the logging will take place, at what rate the logging will take place or what species will be logged. In *Kleppe v. Sierra Club, supra,* —— U.S. at ——, 96 S.Ct. 2718, the Supreme Court recently recognized that a comprehensive impact statement may be required where proposed federal actions will have a "cumulative or synergistic" environmental impact upon an area. The need for such a statement depends on the facts of each case. *Sierra Club v. Froehlke, supra,* 534 F.2d at 1297. The critical question is whether the actions are essentially independent or interdependent and whether each action involves an irretrievable commitment of resources beyond what is actually expended on each project. *Id.*

We adhere to the view implicit in our prior opinion that a comprehensive EIS is required in this case. The EIS before us is adequate in most respects. However, more specific information is needed to apprise the decision makers as to where, when, what species of trees, and at what rate logging will occur in the Portal Zone throughout the life of the Plan. This information is needed to determine not only how many areas will be logged, but which areas will be affected so that fragmentation of the remaining large blocks of virgin forest can be avoided. Furthermore, as scientific, educational and recreational demands increase in the area,

---

**24.** Areas of high erosion and shallow soils are among those which are recommended for deletion.

**25.** Our disposition with respect to future sales, discussed *infra,* does not require a different result. Approximately 5,000 acres of timber remain uncut within the existing sales. This area is approximately one-half of one percent of the total area within the BWCA. At least 501,000 acres of virgin timber, or nearly 50% of the total area within the BWCA, will remain after completion of the existing sales. Thus the existing sales represent only a negligible incursion into the virgin forest areas of the BWCA.

this information is necessary to keep the decision makers informed as to the best available multiple use policy for the area.

We have been informed by the Forest Service that it is currently preparing a Timber Management Plan for the Superior National Forest on which an EIS will also be filed. The Forest Service says that this document will contain detailed consideration of a number of subjects, including sale site selection, harvest rates and mitigation. We are assured by the Forest Service that no new sales will be approved until the Timber Management Plan and accompanying EIS are filed.

Under these circumstances, we think it appropriate to dissolve the permanent injunction only with respect to the existing timber sales. The Forest Service concedes that the BWCA, EIS and Management Plan were not intended to comprehensively analyze the environmental effects of timber management in the BWCA. Nonetheless such analysis is necessary.[26]

### C. Substantive Compliance Under NEPA.

The district court held that the Forest Service's decision to permit logging in the Portal Zone is arbitrary under NEPA. 401 F.Supp. 1323–1325. Five factors were cited by the district court to support its decision. First, the inadequacy of the EIS makes a good faith balancing of environmental factors impossible. Second, no meaningful distinction exists between the Portal Zone and the Interior Zone. Third, the decision to log is based on the unsound assumption that sufficient virgin forest exists to accommodate the other uses of the BWCA. Fourth, the decision to log assumes that mining can be halted in the BWCA. Fifth, logging in virgin forest areas violates the Wilderness Act. We reject each of these points. We hold that the Forest Service's decision to permit logging in the Portal Zone is not arbitrary under NEPA.

First, as discussed *supra*, the EIS is procedurally adequate under NEPA with respect to the existing sales. As to future sales, the EIS, although incomplete in certain respects, provides sufficient information to justify a general policy which permits logging in the future.

Second, a meaningful distinction does exist between the Portal Zone and Interior Zone. The BWCA has been managed under the two zone concept since 1941. Some 90% of the BWCA's waterways are in the Interior Zone. Thus, since most of the recreational use of the BWCA occurs on the waterways, the Forest Service could reasonably conclude that the Interior Zone should be managed with a view toward preserving the naturalness of the area with more restrictions than the Portal Zone.

Third, the EIS and Management Plan do accord sufficient consideration to virgin forest areas. The two zone management policy excludes most of the virgin forest from commercial harvest. There is no indication that any present or future scientific, recreational or educational demand for virgin forest will not be met because of commercial harvesting in the Portal Zone.

Fourth, the district court's consideration of future mineral activity is speculative. If and when the Forest Service changes its current policy of prohibiting mineral activity, another EIS will be drafted with respect to the environmental factors.

Fifth, the Wilderness Act does not prohibit commercial timber harvesting in the virgin areas of the BWCA's Portal Zone.

In summary, the evidence shows that the decision to manage the vegetation in the Portal Zone in part by commercial logging is not arbitrary. All parties acknowledge that the vegetation in the BWCA must be managed in some manner. The art of prescribed burning has not been perfected. Logging is a legitimate vegetative alterna-

---

**26.** If the specific provisions of the Timber Management Plan and EIS are in all material respects comparable to and compatible with the information already provided concerning the existing timber sales, the district court shall then promptly dissolve the injunction in its entirety.

tive. Timber harvesting is a controllable tool which can safely take the place of fire.

*III. Remedy.*

The permanent injunction as it relates to the Wilderness Act is dissolved. The permanent injunction under NEPA is dissolved only as it relates to the existing sales. With respect to future sales, the permanent injunction will remain in force until the Forest Service files its new Timber Management Plan and related EIS for the Superior National Forest, at which time the injunction shall be completely dissolved provided those documents contain specific provisions relating to future timber cutting which in all material aspects are comparable to and compatible with the information supplied concerning the existing timber sales.

Reversed.

## APPENDIX A

Commercial harvesting of virgin timber has historically been a permissible use within the Portal Zone of the BWCA. This logging has been sanctioned by both congressional and administrative authority. During most of this century, the BWCA has been managed under a policy of multiple use forest management. This concept implies that renewable surface resources should be administered for a number of uses (including, among others, timber, water, wildlife, recreation and scientific research) in a combination that will best meet the needs of the American people without impairment.

The first BWCA multiple use policy resulted from a report prepared by Arthur Carhart, a landscape artist for the Forest Service. In 1922, Carhart recommended that logging be prohibited within a reasona-

ble distance of the BWCA's lakes and streams in order to protect the scenic value of the region by preserving the effect of a comparatively undisturbed forest. Logging was to be continued with proper restrictions under Carhart's plan however. This multiple use policy was recognized by the Department of Agriculture as early as 1926.

In 1930, the Forest Service promulgated Regulation L–20 which dedicated different classes of areas for different uses. Among the areas designated were "natural areas" in which timber cutting was prohibited and "primitive areas" in which logging was declared to be a compatible use. Experimental Forests and Ranges, Natural and Primitive Areas, Forest Service Regulation L–20 (October 1930). The Superior National Forest was classified as a "primitive area" under Regulation L–20 and commercial timber harvesting was permitted to continue as a compatible use of the area.

The Shipstead-Newton-Nolan Act, codified at 16 U.S.C. §§ 577 *et seq.* was also passed in 1930. This Act gave congressional approval to the Carhart proposal to prohibit logging in the vicinity of lakes and streams. Throughout the 1930's however, the Forest Service continued to permit commercial timber harvesting in the Superior Primitive Area as it was then called, with the exception of the shoreline areas, in conformance with its theretofore stated policy of multiple use forest management.[1]

In 1941, the Superior Roadless Area [2] was divided into two zones. The northern zone or "no-cut zone" was reserved from cutting in order to preserve the aesthetic value of the forest and waters located therein. The southern zone was not reserved from timber harvest and, after World War II, large scale commercial logging resumed in the virgin areas outside the "no-cut zone."

1. A typical statement of the Forest Service's policy is contained in the 1932 Superior National Forest Primitive Area Report, Plaintiffs' Exhibit 156 at 7:

   Cutting operations under selective logging and 100 per cent coniferous brush disposal are not inimical to the preservation of the natural beauty of the Primitive Area and will

be permitted on government land in strict conformity with the stipulations of the Shipstead, Newton, Nolan Bill which provides specifically for the safeguarding of our lake shores against ruthless logging.

2. In 1938, the name of the area was changed from the Superior Primitive Area to the Superior Roadless Area.

In 1948, Secretary of Agriculture Clinton P. Anderson approved a Plan of Management drafted by the Forest Service which permitted commercial logging to continue outside the "no-cut zone." [3] The Plan stated its general purpose as follows:

> The general purpose of the plan of management is, without unnecessary restrictions on other uses including that of timber, to maintain the primitive character of the areas, particularly in the vicinity of lakes, streams and portages, and to prevent as far as possible the further intrusion of roads, aircraft, motor boats and other developments inharmonious with that aim.

Management Plan—Superior Roadless Areas (February 13, 1948), at 1. Under the 1948 Plan of Management, commercial harvesting of virgin timber did, in fact, continue outside the "no-cut zone" until the Wilderness Act was passed in 1964. The statement of policy quoted above, under which such logging was permitted to continue, was inserted nearly verbatim into the special BWCA provision, 16 U.S.C. § 1133(d)(5), contained in the Wilderness Act.

In 1958, the name of the area was changed from the Superior Roadless Area to the Boundary Waters Canoe Area.

In the Multiple Use-Sustained Yield Act of 1960, 16 U.S.C. §§ 528–531, Congress recognized the policy of multiple use and sustained yield with respect to the management of the national forests. Congress declared that " * * * the national forests * * * shall be administered for outdoor recreation, range, *timber*, watershed, and wildlife and fish purposes." 16 U.S.C. § 528 (emphasis supplied). The Act specifically authorized and directed the Secretary of Agriculture " * * * to develop and administer the renewable surface resources of the national forests for multiple use and sustained yield of the several products and services obtained therefrom." 16 U.S.C. § 529. In the Wilderness Act, Congress declared that nothing therein was to be construed to interfere with the purposes of the Multiple Use-Sustained Yield Act of 1960. 16 U.S.C. § 1133(a)(1).

The legislative history of the Wilderness Act is equally clear.

The Wilderness Act was initially introduced by Senator Humphrey on February 11, 1957. 103 Cong.Rec. 1892 (1957). Although the bill, S. 1176, did not contain the special BWCA provision, Senator Humphrey stated the following: "This bill will not interfere with, but will perpetuate, the present multi-purpose administration of these national forest areas." *Id.* at 1894.

Despite Senator Humphrey's admonition, the initial version of the Wilderness Act created a great deal of controversy in Minnesota with respect to logging in the BWCA. Commercial timber interests feared that the commercial enterprise prohibition of S. 1176, without special BWCA recognition, would preclude commercial logging in the area. The Forest Service and Department of Agriculture were also opposed to the Act in many respects, including its failure to provide special treatment for the BWCA. On June 19, 1957, Dr. Richard E. McArdle, Chief of the Forest Service, submitted a substitute bill in behalf of the Department of Agriculture which included the special BWCA provision. *Hearings on S. 1176 Before the Senate Comm. on Interior and Insular Affairs*, 85th Cong., 1st Sess. 96–97 (1957) [hereinafter cited as *1957 Hearings*]. The special BWCA provision was necessary, according to McArdle, be-

---

**3.** The Plan discussed the conflicting demands upon the area and the desirability of multiple use forest management. The Forest Service said:

> *Another economic* element of the situation is that of the timber resource. Many visitors no doubt would like to see all timber on the roadless areas preserved from cutting. It is a natural feeling, especially if their observations happen to include logging, which at best leaves *temporary* scars on the land-

scape. On the other hand, the timber stands of merchantable size in the roadless areas represent nearly a third of the present stand on the Superior National Forest and five percent or more of the total stand in the State of Minnesota. Only a portion of this needs to be withdrawn from the channels of manufacture and trade to protect effectively the recreational values.

Management Plan—Superior Roadless Areas (February 13, 1948), at 10.

cause the BWCA would not otherwise be manageable as a wilderness area under the Act since timber cutting had been an historical and continuing use of the area. *Id.* at 100. Senator Humphrey appeared before the Senate Committee on the same day as McArdle. Senator Humphrey emphasized again that the purpose of S. 1176 was to preserve wilderness values by preserving the status quo. In reference to S. 1176, he said:

> No area now devoted to any economic purpose, or to any other development program, is withdrawn from its use by this legislation.
>
> * * * [W]ith regard to each area involved, this proposal is one that respects the importance of other programs. *It is a multiple-purpose wilderness program.* Every area included in the proposed national wilderness preservation system is now serving some other purpose, or purposes, consistent with the continued protection of the area as wilderness. *Under this legislation, these areas will continue to serve those purposes* and they will be administered by the same agencies that handle them now.

*1957 Hearings* 20–21 (emphasis supplied).

In response to the Department's objections, Senator Humphrey introduced S. 4028 on June 18, 1958, which contained the changes urged by the Department of Agriculture, including the special BWCA provision. 104 Cong.Rec. 11552, 11553 (1958). Before the Senate, Senator Humphrey referred to a meeting held in Minnesota at which certain business enterprises voiced criticism of the bill as originally proposed without the special BWCA provision. Senator Humphrey said:

When I went to the meeting in Minnesota to which I referred to a moment ago, for example, I took with me the first revision of the bill that had clarified what our Minnesota friends had misunderstood and had met the valid objections they had pointed out to us.

*Id.* at 11551 (1958). The change to which Senator Humphrey referred was, of course, the special BWCA provision permitting timber cutting to continue in the BWCA.

Shortly after S. 4028 was introduced, Forest Service Chief McArdle wrote to Senator Humphrey and stated:

> The provisions of the latest Wilderness Bill, S. 4028, of the 85th Congress, do not, in our opinion, specify any change in the present management policies for the Boundary Waters Canoe Area, hence if a bill similar to S. 4028 were enacted, the Forest [Service] could manage this area in the same manner as it is now being managed.

Letter from Richard E. McArdle to Senator Hubert Humphrey, September 4, 1958. Significantly, both sides of the controversy—the business interests in northern Minnesota who lodged the initial protest as well as certain environmental interests—were under the same impression as Forest Chief McArdle.[4]

On February 19, 1959, Senator Humphrey introduced S. 1123, another wilderness bill, for Senate consideration. 105 Cong.Rec. 2636 (1959). S. 1123 contained the special BWCA provision. *Id.* at 2642. In his remarks, Senator Humphrey again emphasized that the measure was a multiple use wilderness program. *Id.* at 2637–2638. With respect to the effect of the bill on commercial interests, Senator Humphrey stated the following:

> In the Superior National Forest, which after all is not a major subject of the national bill but only a small detail among many, not one inch of the roadless area boundaries are changed *nor any of the existing provisions altered. The bill changes nothing whatsoever in the Superior National Forest.*
> *1958 Hearings* 159 (emphasis supplied).

---

4. William Esseling, Chairman of the Ely, Minnesota, Citizens Committee, testified before the Senate Committee on Interior and Insular Affairs that the objections of the business groups had been met as to mining, lumbering, and prospecting. *Hearings on S. 4028 Before the Senate Comm. on Interior and Insular Affairs*, 85th Cong., 2d Sess., 77 [hereinafter cited as *1958 Hearings*]. In a statement submitted to the Committee, Friends of Wilderness stated the following:

I feel, Mr. President, that I can indeed assure the Senate that commercial interests will suffer no damage whatever by this program.

None of us here in the Senate need fear that after the enactment of this measure the commercial interests, whom we all respect and value, will come to us and complain that they have been hurt. None of them will suffer damage.

\* \* \* \* \* \*

Whatever commercial interests there may legitimately be in these areas of wilderness will thus be carefully safeguarded in this program.

*Id.* at 2637.

The next version of the Wilderness Act, S. 174, was introduced on January 5, 1961, and also contained the special BWCA provision. 107 Cong.Rec. 189–193 (1961). The Senate Committee on Interior and Insular Affairs favorably recommended passage of S. 174. S.Rep.No.635, 87th Cong., 1st Sess. 1 (1961). During the House hearings on the measure, in May 1962, then Secretary of Agriculture Freeman testified that the management of the BWCA would not be changed by the Wilderness Act. *Hearings on S. 174 Before the Subcomm. on Public Lands of the House Comm. on Interior and Insular Affairs*, 87th Cong., 2d Sess. 1217 (1962).

The Wilderness Act became law in 1964. The final version, numbered S. 4, was identical to S. 174 except for a change in the designation of "forest superintendent" to "forest supervisor." S.Rep.No.109, 88th Cong., 1st Sess. 1 (1963). S. 4, of course, contained the special BWCA provision which was enacted into law. During the course of the Senate Hearings on S. 4, Edward P. Cliff, Chief of the Forest Service, appeared on behalf of the Agriculture Department to express the Department's strong support of the bill. Like his predecessors, Cliff expressed the view that the status quo would be maintained in the BWCA, and timber harvesting would continue in the area under the Act. *Hearings on S. 4 Before the Senate Comm. on Interior and Insular Affairs*, 88th Cong., 1st Sess.

35 (1963). The Senate Committee again recommended passage of the bill. In its report, the Committee specifically noted that no timber lands would be withdrawn from lumbering operations.

\* \* \* [T]he Wilderness Preservation System can be established without affecting the economic arrangements of communities, counties, States or business enterprises since the areas are already withdrawn, or because existing private rights and established uses are permitted to continue. *There will be no withdrawal of lands from the tax base of counties or communities; no withdrawal of timberlands on which lumbering operations depend* \* \* \*.

S.Rep.No.109, 88th Cong., 1st Sess. 2 (1963) (emphasis supplied).